[No. G038729. Fourth Dist., Div. Three. Jan. 16, 2008.]

In re ELIZABETH M., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
ERIC M., Defendant and Appellant.

**1552**

## COUNSEL

Sharon S. Rollo, under appointment by the Court of Appeal, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Alexandra G. Morgan, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

## OPINION

**BEDSWORTH, Acting P. J.**—Eric M. appeals from a judgment terminating dependency jurisdiction over his daughter, Elizabeth M., and returning her to

the custody of her mother, Stacy A. Eric argues the court denied him due process by depriving him of a contested hearing on the termination issue, and further erred by issuing an exit order, which significantly reduced his visitation, based solely upon a stipulation of questionable validity.

We conclude the second contention has merit. The stipulation in question, containing proposed findings and orders to be made in the event of termination, was signed on the first page by all counsel. The third page contained a handwritten statement of the existing visitation schedule then enjoyed by Eric, but was interlineated, in a different handwriting, to reflect a significant reduction in the amount of that visitation. Those interlineations were not initialed by any counsel, and there is no way to ascertain from the record when or under what circumstances they were made. Moreover, there was no request for such a reduction pending before the court at the time of the termination hearing, and no evidence in the record to support such a request had one been made. Under those circumstances, it was error for the court to simply adopt, without question, the altered stipulation.

The judgment is consequently reversed, and the case is remanded with directions to enter a new termination order, which is changed only to reflect that Eric's visitation schedule shall remain as it was prior to the original termination order.

## FACTS

On June 14, 2005, the Orange County Social Services Agency (SSA) took 20-month-old Elizabeth into protective custody due to allegations of general neglect and caretaker absence. Elizabeth's parents, Eric and Stacy, were arrested on drug charges and SSA placed Elizabeth at Orangewood Children's Home. Both parents had extensive criminal histories, and SSA recommended disposition of the case be postponed until criminal proceedings were resolved.

SSA placed Elizabeth with her godparents. Upon Stacy's release, SSA offered reunification services to both parents. Stacy was granted weekly visitation with Elizabeth and Eric was granted twice-monthly visitation while he remained incarcerated in Orange County. On December 10, 2005, SSA placed Elizabeth with her paternal aunt and uncle, as her godparents were no longer able to care for her.

During these early visits with Eric, Elizabeth recognized her father and enjoyed seeing him, although she sometimes had difficulty with the visitation environment. Eric interacted properly with Elizabeth and was aware of her moods and needs during visits.

On February 28, 2006, Stacy's visits were increased to twice weekly. On March 23, SSA recommended Eric's visits be reduced to once per month due to Eric's transfer to Wasco State Prison, where he was to serve a 10-year sentence. The change was requested because the new facility was far from Orange County and the travel would potentially be difficult for Elizabeth. The court granted that request.

On May 17, 2006, Elizabeth was returned to her mother's care, as Stacy was able to maintain sobriety and made sufficient progress on her case plan requirements. Eric remained incarcerated, but expressed a desire to become a better parent and participate in the case plan. Elizabeth reacted positively to visiting her father, and Eric was loving and interacted appropriately with the child.

Eric appeared at the July 11, 2006, 12-month review hearing. He requested that his visitation schedule be increased. Stacy, meanwhile, requested the visitations with Eric be reduced to every other month or once every three months. Stacy's counsel argued that Elizabeth's age made the seven-hour trip to the prison too difficult. The court, per Commissioner Gary Vincent, stated it would not consider a reduction in Eric's visitation without a formal motion and evidence presented showing there was good cause for a reduction. Moreover, the court emphasized that Elizabeth's monthly visitation with Eric was important, and must be conducted in such a way as to ensure Eric had as much time as possible with Elizabeth during each visit.

Eric and Elizabeth continued thereafter to enjoy their monthly visits. A social worker facilitated the visits, picking Elizabeth up at 5:00 a.m. on the day of the visit and making the drive to Centinela State Prison (it is unclear when Eric transferred from Wasco to Centinela). The social worker reported that Elizabeth would sleep the first couple of hours of the drive, and that she recognized the prison building and associated it with her father, becoming excited to see him. The visits were appropriate and loving. Elizabeth would generally nap during the drive back and transitioned smoothly into her normal routine without any significant issues.

At the 18-month review hearing on January 11, 2007, SSA reported that since July of 2006, Elizabeth (along with her two half siblings) had been residing with Stacy in an apartment shared with another woman and her child. Stacy was commended for her "dedication and commitment to all three of her children."

Despite Stacy's progress, however, SSA recommended that the dependency be continued, and that Stacy be provided additional family maintenance services. As the report reflected, Stacy had not yet obtained permanent

housing, and although her current sobriety was encouraging, the "rather lengthy" duration of her substance abuse problems warranted additional monitoring. With respect to Eric, SSA recommended that his visitation schedule be maintained at once per month while he remained incarcerated.

The court adopted SSA's recommendations, and continued the dependency, but also set a termination review hearing for April 5, 2007. At the time of that hearing, SSA reported that Stacy "continues to demonstrate her ability to safely care for and meet the needs of all three of her children, including Elizabeth." It also noted that a social worker was continuing to facilitate monthly visits between Eric and Elizabeth, and those visits were going well. Elizabeth reportedly enjoyed seeing her father and liked visiting because "they 'play and have fun.' " Elizabeth also did well during the drive to and from the prison facility.

The report also noted that Eric was adamantly opposed to a termination of jurisdiction, because he believed that Elizabeth remained at risk in Stacy's care. However, SSA did not share his fears, noting instead that while it "had minor concerns regarding housing problems that may arise, there are really no identifiable safety risks that warrant continued supervision at this point in time." As a consequence, SSA recommended termination of jurisdiction.

Eric did not appear at the termination hearing, apparently because he was anticipating being scheduled for surgery and was concerned that leaving the prison for a day might jeopardize his chances. In connection with the hearing, the parties filed a multipage stipulation regarding proposed orders and findings, which covered the disposition of certain issues in the event the court ordered termination of the dependency proceedings. The first page of that stipulation was signed by all counsel, including Eric's counsel, Michael Hughes, although Hughes was careful to include a notation next to his signature which made clear Eric was objecting to the termination itself.

The proposed order regarding Eric's visitation was contained on the fourth page of the stipulation, and was not separately signed by counsel. In a handwritten paragraph, the proposal originally reflected Eric should continue to have monthly monitored visitation with Elizabeth, with transportation to be provided by a party agreed upon by Eric and Stacy. However, that original proposal was subsequently interlineated in what appears to be a different handwriting. The interlineation altered the proposal to reflect that Eric would be allowed visitation with Elizabeth only once every two months, "weather permitting." The interlineations were not initialed by any of the parties or their counsel, and there was no indication of either when, or under what circumstances, they had been made. Moreover, it appears that Hughes himself executed the stipulation at some point prior to the hearing, as it was his associate, April Kleis, who actually appeared for Eric.

The hearing was brief, and commenced with Judge James Marion noting he was new to the proceedings and congratulating Stacy for her progress. The court then admitted SSA's report into evidence, and stated it was adopting SSA's recommendation. Kleis noted for the record that Eric was objecting to the termination of jurisdiction, but offered no argument, and made no request to offer evidence on the point.

The court then declared "The dependent child proceedings are terminated with the attached O.C. juvenile court custody orders." There was no discussion or argument regarding the substance of those orders, and no mention at all of Eric's visitation schedule.

The termination order ultimately entered by the court reflected the altered version of the proposed visitation order, thus reducing Eric's visitation with Elizabeth by at least one-half from what it had been prior to the termination hearing—and perhaps more if the weather did not "permit."

I

Eric's first contention is the court denied him due process because it failed to provide him with a "contested hearing" on the issue of whether jurisdiction should be terminated. The contention has no merit. As the record reflects, the court did schedule a hearing, and Eric was given both notice and an opportunity to attend and be heard on the issue. That is all due process required. (*In re Brian K.* (2002) 103 Cal.App.4th 39, 42 [126 Cal.Rptr.2d 580].)

Although it appears Eric may have been unavailable to attend the hearing on the date scheduled, due to his need to remain available for an anticipated surgery, that circumstance would not, in and of itself, create a due process violation. Because Eric had notice of the hearing, it was incumbent upon him to request a continuance if he felt his presence was necessary. He did not. Moreover, the record reflects that Eric's counsel was present at the hearing, and voiced no objection to proceeding in his absence. Under those circumstances, the court did not err by terminating jurisdiction without affording Eric any additional opportunity for a contested hearing.

II

Eric's second complaint, that the court erred in ordering his visitation schedule reduced, is more persuasive. We start by acknowledging the proposition lower courts are presumed to act properly in reaching their decisions—or, in the language of Evidence Code section 664, "that official duty has been regularly performed."

Unfortunately, that presumption alone is not sufficient to carry the day in the highly irregular situation presented in this case.[1] The only possible support we can discern for the court's reduction of visitation is the rather suspect "stipulation," which was altered without explanation and under circumstances no one seems able to explain.

Indeed, the only party who has appeared to defend the visitation order on appeal is SSA—which is frankly surprising since SSA was clearly supportive of Eric's current visitation order at the time of the termination hearing in the court below.[2] Nonetheless, SSA now defends the order reducing that visitation, but makes no effort to shed any light on the stipulation.

In fact, SSA's argument essentially ignores the stipulation entirely, suggesting instead that the court's order was proper even in its absence. First, SSA explains that even though no request for a reduction in Eric's visitation was pending at the time of the termination order, he was effectively on notice that his visitation was subject to modification, because "[u]pon termination of dependency jurisdiction, the juvenile court is *empowered* to issue 'an order determining the custody of, or visitation with, the child.' ([Welf. & Inst. Code,] § 362.4.)" (Italics added.)

We do not find that contention persuasive. Eric had been explicitly assured there would be no reduction in his visitation without a formal motion and supporting evidence. To ignore that fact and rely upon the inherent power of the court is to blink at both reality and fairness. That's two blinks too many. Moreover, even granting respondent the *power* of the court to change an existing order, courts do not arbitrarily make such changes in the absence of some compelling evidence to support them, and Eric was thus entitled to presume the court would not do so here.

 Unless we credit the altered stipulation (which, as we discuss *post*, we do not) there is simply no basis for concluding that Eric should have understood the frequency of his visitation was at issue at the hearing. Because Eric was not reasonably on notice that the court was contemplating a reduction, we must also reject SSA's assertion Eric "waived" any objection by not raising it at the hearing. A litigant cannot be said to have waived his rights on an issue he did not know was being decided.

We also reject SSA's contention that "[a]ssuming arguendo that the issue is not waived, the court had ample evidence before it" to support the reduction

---

[1] We assume there was a perfectly ingenuous explanation for the unexplained emendation of the stipulation in question here; unfortunately none was offered and none suggests itself to us. We have attached the stipulation to this opinion. No one should ever try to file such a stipulation without an on-the-record explanation.

[2] Stacy filed no respondent's brief on appeal.

order. In our view, the record in this case contains no evidence supporting a change in Eric's visitation schedule at the time of the termination order. As we have already noted, SSA's own report at that time painted a very positive picture of the visits, and expressly stated that Elizabeth enjoyed them. Moreover, despite the lengthy drive necessary to get to the prison, Elizabeth tolerated the journey very well, and frequently slept. She exhibited no difficulties upon her return.

On appeal, however, SSA ignores that most recent visitation report, and relies rather disingenuously upon evidence from substantially earlier in the dependency proceeding to undermine it. For example, SSA argues there was sufficient evidence to demonstrate that visitation with Eric was actually quite difficult for Elizabeth—but then cited only evidence from *January of 2006*— almost a year and a half prior to the termination hearing. Such outdated evidence in no way undermines SSA's conclusion, given in *April of 2007*, the visitation was very positive for her. SSA also relied upon the fact the prison itself had made the visitation difficult, but then cited only one instance which had occurred in April of 2006—a full year prior to the termination hearing— where the prison denied a visit because it required additional paperwork. Our record demonstrates the court resolved that problem by issuance of a minute order in May of 2006. Such outdated evidence is wholly insufficient to undermine the positive portrayal of the visitation enjoyed by Eric and Elizabeth in April of 2007. It's a little late to be suddenly discovering the visitation is onerous.[3]

SSA's final evidentiary tack is to suggest that "visitation would become even harder once Stacy had to facilitate visits without SSA's help." However, that assertion is pure speculation. Stacy herself made no such argument, let alone substantiated it with evidence. Further, we note that the original (by which we mean preinterlineation) version of the proposed visitation order on counsels' stipulation did not contemplate that Stacy herself would be the one driving Elizabeth to the prison. Instead, it recited that transportation to the prison would be provided by a "party agreed upon by mother and father." Neither the trial court, nor we, could reasonably conclude that the burden of handing Elizabeth over to an agreed-upon third party for transportation to the prison once per month would be substantially greater than it had been when SSA was the one providing that transportation.

---

[3] We emphasize that we are not in a position to second-guess a visitation call of this kind. If SSA had convinced the court the logistics of this visitation were too complicated to justify its burden, we would be perfectly prepared to accept that conclusion as reasonable. But the problems had been ironed out—at least temporarily—and SSA's latest reports about visitation were positively glowing. We are therefore singularly unimpressed to find SSA now ignoring those and urging us to ascribe adoption of its earlier complaints to the trial court.

Because the court's order reducing Eric's visitation was both made without notice, and unsupported by any evidence, we cannot sustain it as an ordinary contested ruling made in the normal course of the termination hearing. Instead, we can sustain it only if we conclude it was properly based upon the interlineated visitation language in the handwritten "stipulation" provided to the court in connection with the termination hearing.

We cannot reach that conclusion. As we have already noted, the altered language in the visitation provision was not signed off by any counsel. It was thus suspicious on its face—and particularly so when considered in light of the undisputed evidence that Eric's visitation had been proceeding so positively. Why would anyone believe Eric intended to agree to such a thing? If there is an answer to this question, it appears nowhere in our record.

Although we have no way of determining exactly how the stipulation came into being, we can envision only two scenarios, and both of those result in a stipulation which was—at best—of questionable reliability. In the first scenario, the language of the visitation provision was altered *after* the stipulation had been reviewed and signed by Eric's counsel, and without his knowledge.

In the second scenario, Eric's counsel was aware of the reduction, and voluntarily stipulated away his client's visitation rights for no apparent reason—without any pending request for a reduction; no evidence to support it; no indication of any tactical advantage to be gained by entering such a stipulation, or of any benefit obtained by Eric in exchange for it; and without Eric himself present at the hearing to protest.

The first scenario suggests a fraud, and the second suggests ineffective assistance of counsel. In either case, the stipulation is highly troubling, and it is clear that the trial court would have committed error by simply adopting it, without question, as the basis for the court's own order. " 'While it is entirely proper for the court to accept stipulations of counsel that appear to have been made advisedly, and after due consideration of the facts, the court cannot surrender its duty to see that the judgment to be entered is a just one, nor is the court to act as a mere puppet in the matter.' (*City of Los Angeles* v. *Harper* (1935) 8 Cal.App.2d 552, 555 [48 P.2d 75].)" (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664 [268 Cal.Rptr. 284, 788 P.2d 1156].)

The stipulation in this case appears to be anything but one which was made "advisedly, and after due consideration of the facts." To the contrary, it contains inexplicably altered terms, which purportedly reflect a father's entirely unnecessary concession on the significant issue of visitation. Because the court here did not ask any such questions, we must conclude the court either did not base its ruling on the stipulation, or did so improperly.

██ In light of the foregoing, we conclude the court's order reducing Eric's visitation was error. As we have explained, it cannot be sustained on the basis of either the evidence before the court or the purported stipulation presented by counsel. We consequently reverse the termination judgment, and remand the case to the juvenile court for the limited purpose of modifying the judgment to reflect that Eric's visitation schedule remains unchanged from what it was prior to the termination. Any change from that schedule in the family court will require the notice and evidence Eric was promised.

Aronson, J., and Ikola, J., concurred.

# APPENDIX

JV-205

CHILD'S NAME: Elizabeth

CASE NUMBER:
JUVENILE:
FAMILY:

**VISITATION ORDER—JUVENILE**
Attachment to Custody Order—Juvenile (form JV-200)

1. ☒ VISITATION
 a. ☐ As set forth in the attached visitation agreement.
 b. ☒ Specific visitation as follows:
 (1) ☒ WEEKENDS (specify starting date):
 ☒ Father ☐ Mother will have the children with him/her:
 ☐ First weekend of the month (specify day(s) and time): from _____ to _____ at _____ ☐ a.m. ☐ p.m.
 ☒ Second weekend of the month (specify day(s) and time): from _____ to _____ at _____ ☐ a.m. ☐ p.m.
 ☐ Third weekend of the month (specify day(s) and time): from _____ to _____ at _____ ☐ a.m. ☐ p.m.
 ☐ Fourth weekend of the month (specify day(s) and time): from _____ to _____ at _____ ☐ a.m. ☐ p.m.
 ☐ Fifth weekend of the month (specify day(s) and time): from _____ to _____ at _____ ☐ a.m. ☐ p.m.
 (2) ☐ ALTERNATE WEEKENDS (specify starting date):
 ☐ Father ☐ Mother will have the children with him/her (specify day(s) and time): from _____ at _____ ☐ a.m. ☐ p.m. to _____ at _____ ☐ a.m. ☐ p.m.
 (3) ☐ MID-WEEK
 ☐ Father ☐ Mother will have the children with him/her (specify day(s) and time): from _____ at _____ ☐ a.m. ☐ p.m. to _____ at _____ ☐ a.m. ☐ p.m.
 (4) ☒ Other (specify day(s) and time(s) as well as any additional conditions):
 
 Father will have monthly monitored visits with ch___ while incarcerated. Father is responsible for obtaining monitor. Upon release the father will have twice monthly monitored visitation with the child. Father is responsible for obtaining monitor.
 
 ☐ Continued on Attachment 1b(4).

2. ☒ SUPERVISED VISITATION
 a. ☒ Father ☐ Mother will have supervised visitation with the minor children according to the schedule ☒ set forth in item 1 above ☐ to be determined by the parents.
 b. The visits will be supervised by (name): _____
 c. The supervisor's phone number is: _____

3. ☒ TRANSPORTATION FOR VISITATION AND PLACE OF EXCHANGE
 a. ☒ Transportation to the visits must be provided by ☐ Father ☐ Mother ☒ Other (specify): Party agreed upon by mother and fa___
 b. ☐ Transportation from the visits must be provided by ☐ Father ☐ Mother ☐ Other (specify): _____
 c. ☐ The children must be delivered and picked up from (specify location): _____
 d. ☐ Other (specify): _____

Form Adopted for Mandatory Use
Judicial Council of California
JV-205 [Rev. January 1, 2000]
**VISITATION ORDER—JUVENILE**
Welfare and Institutions Code, §§ 302(b), 304, 362.4, 726.55;
Family Code § 3100 et seq.; Cal. Rules of Court, rule 1457
www.courtinfo.ca.gov